**PEPCOL MANUFACTURING CO., a Colorado corporation, Petitioner,**

v.

**DENVER UNION CORPORATION, a corporation, and Western Stock Center, Inc., a corporation, Respondents.**

No. 83SC160.

Supreme Court of Colorado, En Banc.

Sept. 17, 1984.

Rehearing Denied Oct. 9, 1984.

Quiat, Bucholtz, Bull & Laff, P.C., Alan H. Bucholtz, Denver, for petitioner.

Tilly & Graves, P.C., Greg L. Perczak, Denver, for·respondents.

QUINN, Justice.

We granted certiorari to review the decision of the court of appeals in *Pepcol Manufacturing Co. v. Denver Union Corporation*, 668 P.2d 971 (Colo.App.1983), relating to the construction of the term "at seller's cost" in a contract between Denver Union Corporation (Denver Union) and Pepcol Manufacturing Company (Pepcol) for the payment of water supplied by the Denver Water Board to Denver Union and ultimately used by Pepcol. Denver Union sought a judgment against Pepcol for $10,-732.39, which represented the amount of surcharge allegedly owed by Pepcol for water used by it under its contract with Denver Union. The trial court construed the term "at seller's cost" to mean the per gallon rate charged to Denver Union by the Denver Water Board and, concluding that

the surcharge was improper, entered judgment in favor of Pepcol on Denver Union's claim. In reversing the judgment and ordering the entry of judgment in favor of Denver Union, the court of appeals held that the term "at seller's cost" was unambiguous and meant the costs actually incurred by Denver Union in providing water to Pepcol. We reverse the judgment of the court of appeals.

The facts are not in dispute. Denver Union's claim against Pepcol for $10,732.39 was based on a surcharge for water furnished to Pepcol during the years 1973 through 1976.[1] This claim was based on a 1970 contract entered into by Denver Union and Herman Horwich, an agent and predecessor in interest of Pepcol. Denver Union, which owned much of the property in the stockyards area, operated a cooperative water service system for the use and benefit of tenants and landowners doing business in the stockyards. During the period of time in question Denver Union obtained water from the Denver Water Board and was billed on the basis of the meter reading on its master meter in the stockyards. In March 1970 Denver Union sold to Horwich a parcel of land which was later transferred to Pepcol. The contract of sale provided in pertinent part as follows:

Seller [Denver Union] agrees to sell and convey to Buyer [Horwich] and Buyer agrees to purchase from Seller the real property described particularly on Exhibit A hereto attached ... subject to utility easements and rights-of-way of record. Seller further agrees to grant and convey to Buyer for use in connection with the property the following:

\* \* \* \* \* \*

The right to connect for water usage to the existing water line owned by Seller located on the east side of the property without payment of a tap fee therefor to Seller (it is understood however that the hookup and meter installation charges shall be at Buyer's expense and that water usage by Buyer shall be metered and the charges of water so used shall be paid by Buyer, its successors or assigns or designee at Seller's cost) ....

Pepcol, which commenced operation of a rendering plant on its property in 1971, connected to Denver Union's main water line and installed a water meter at its plant location. The general manager of Pepcol testified that during 1971 and 1972 Denver Union billed Pepcol each month for the amount of water shown on Pepcol's plant meter. The cost of the water to Pepcol was billed at the same per gallon rate as the Denver Water Board charged Denver Union. The president of Denver Union corroborated this testimony. He testified that during the first two years of Pepcol's operation Denver Union would receive a bill from the Denver Water Board for water metered to Denver Union's master meter; a Denver Union employee would then read the meters of the various users connected to Denver Union's main line; and Denver Union would "bill the users for their prorata share of the water" at the same per gallon rate as the Denver Water Board charged Denver Union. This method was followed because, according to Denver Union's president, "[w]e had agreed not only with Pepcol but with all of the other users of the system to provide water at our cost, so we were being consistent here."

In mid-1973, however, Denver Union became aware that it was paying the Denver

1. Pepcol commenced this litigation by filing a complaint against both Denver Union and Western Stock Center, Inc. So far as the pleadings and trial record reflect, however, the role of Western Stock Center, Inc., is identical to that of Denver Union and we refer to them collectively as Denver Union. Pepcol's complaint against Denver Union was for breach of a 1976 contract between Denver Union and Pepcol. Pepcol alleged that Denver Union failed to re-

fund funds advanced by Pepcol for the installation of connecting lines in a new water system that was to be installed in the stockyards area by the Denver Water Board. The purpose of this new system was to replace the water system originally constructed by Denver Union in the stockyards area. The trial court entered judgment in favor of Pepcol on its claim, and this aspect of the case is not contested by Denver Union in this proceeding.

Water Board a 20–25 percent greater sum than it received from the businesses operating under its water service system in the stockyards. Although Denver Union was unable to determine where in the system its water loss was occurring, it decided to assess a surcharge against all businesses operating under its water service system to make up the discrepancy. The surcharge was calculated by itemizing the meter reading of each business and then charging an amount equal to the percentage of that business' use to the total charges assessed against Denver Union by the Denver Water Board. Pepcol, from the inception of the surcharge billing through 1976, refused to pay the surcharge on the ground that the 1970 contract limited its payment obligation to the usage shown at its plant meter at a price equal to the per gallon rate charged Denver Union by the Denver Water Board.

The trial court found in relevant part as follows: that the 1970 agreement contemplated installation of a water meter at Pepcol's plant to measure its water use; that the reference in the contract to "water meter was to the separate meter on [Pepcol's] property and did not refer to the main meter used as a basis for the Denver Water Board's billing to [Denver Union]"; that until mid-1973 Pepcol was billed on the basis of this internal metering at the same per gallon rate as Denver Union paid the Denver Water Board; and that Denver Union's discovery of a water loss within the system did not give it the right to surcharge Pepcol in order to recoup its loss.[2] The trial court accordingly entered judgment for Pepcol on Denver Union's claim. Denver Union appealed to the court of appeals which reversed the judgment. The court of appeals held that the term "at seller's cost" was unambiguous and con-

strued it to mean the direct cost incurred by Denver Union in providing water to users such as Pepcol, even though this cost exceeded the cost of water used by Pepcol as measured by its plant meter and as calculated on the basis of the per gallon rate paid by Denver Union to the Denver Water Board. We granted certiorari to consider the court of appeals' construction of the term "at seller's cost" in the 1970 contract.

Pepcol argues that the term "at seller's cost" is ambiguous and that the extrinsic evidence of the course of conduct engaged in by the parties in performing their obligations under the contract supports the contractual construction adopted by the trial court. Basic and long-standing principles of contract law provide the framework for our resolution of the issue raised in this case.

 A fundamental rule of contract law is that the court should strive to ascertain and give effect to the mutual intent of the parties. 4 S. Williston, *A Treatise on the Law of Contracts* § 601 (W. Jaeger ed. 1961). Interpretation of a written contract is generally a question of law for the court. *E.g., Union Rural Elec. Ass'n v. P.U.C.,* 661 P.2d 247, 251 (Colo.1983); *Radiology Professional Corp. v. Trinidad Area Health Ass'n,* 195 Colo. 253, 256, 577 P.2d 748, 750 (1978). An integrated contract in the first instance is to be interpreted in its entirety with the end in view of seeking to harmonize and to give effect to all provisions so that none will be rendered meaningless. *E.g., Union Rural Elec. Ass'n,* 661 P.2d at 252; *Radiology Professional Corp.,* 195 Colo. at 256, 577 P.2d at 750; 4 S. Williston, *supra,* § 601; *Restatement (Second) of Contracts* § 202(2) (1981). In the absence of contrary manifestation of

2. We note that the trial court at one point in its written findings stated that the agreement was "clear and unambiguous" and at another point stated that it "must look to the intent of the parties in the first instance as evidenced by the language of the agreement and the course and conduct of the parties." Although the trial court

erred in stating that the agreement was unambiguous, this error was corrected when the trial court admitted extrinsic evidence relating to Denver Union's billing practices for the first two years of the agreement in order to resolve the meaning of the contractual term "at seller's cost."

intent in the contract itself, contractual terms that have a generally prevailing meaning will be interpreted according to that meaning. *E.g., Buckley Bros. Motors, Inc. v. Gran Prix Imports, Inc.,* 633 P.2d 1081, 1083 (Colo.1981); *Radiology Professional Corp.,* 195 Colo. at 256; 577 P.2d at 750; *Restatement (Second) of Contracts, supra,* § 202(3)(a). It is only where the terms of an agreement are ambiguous or are used in some special or technical sense not apparent from the contractual document itself that the court may look beyond the four corners of the agreement in order to determine the meaning intended by the parties. *See Buckley Bros. Motors,* 633 P.2d at 1083; *Radiology Professional Corp.,* 195 Colo. at 256, 577 P.2d at 750. It is axiomatic that in the absence of an ambiguity a written contract cannot be varied by extrinsic evidence. *Union Rural Elec. Ass'n,* 661 P.2d at 251; *Buckley Bros. Motors,* 633 P.2d at 1083; *Radiology Professional Corp.,* 195 Colo. at 256, 577 P.2d at 750.

Whether an ambiguity exists is also a question of law. *Buckley Bros. Motors,* 633 P.2d at 1083; *Alley v. McMath,* 140 Colo. 600, 602, 346 P.2d 304, 305 (1959).[3] When an ambiguity is found to exist and cannot be resolved by reference to other contractual provisions, extrinsic evidence must be considered by the trial court in order to determine the mutual intent of the parties at the time of contracting. *E.g., Union Rural Elec. Ass'n,* 661 P.2d at 251; *Radiology Professional Corp.,* 195 Colo. at 256, 577 P.2d at 750. This extrinsic evidence may include any pertinent circumstances attendant upon the

transaction, including the conduct of the parties under the agreement. *Nahring v. Denver,* 174 Colo. 548, 552, 484 P.2d 1235, 1237 (1971); 4 S. Williston, *supra,* § 623. As we stated in *Nahring:*

> [W]hen a contract or agreement has been given a practical construction, as reflected by the conduct and acts of the parties in its performance, such construction may, and perhaps even should, be considered by the court in eliminating any ambiguity, and in ascertaining the mutual meaning of the parties at the time of the contracting.

174 Colo. at 552, 484 P.2d at 1237. "Once a contract is determined to be ambiguous, the meaning of its terms is generally an issue of fact to be determined in the same manner as other disputed factual issues." *Union Rural Elec. Ass'n,* 661 P.2d at 251 n. 5.

Guided by these principles, we turn to an examination of the contractual provision which is the source of the dispute in this case. The term "at seller's cost" is facially ambiguous. On the one hand, it could be interpreted as the cost of the water actually used by Pepcol, calculated at the same rate as the per gallon cost charged to Denver Union by the Denver Water Board. In the alternative, this term could mean the cost actually expended by Denver Union in furnishing water to all its users, even though Denver Union's cost was in excess of the per gallon rate charged it by the Denver Water Board. Because other provisions of the contract fail to resolve the meaning of "at seller's cost,"[4] the trial court properly considered extrinsic evidence in resolving the ambiguity.

3. In determining whether a contract is ambiguous, the court may conditionally admit extrinsic evidence on this issue. 4 S. Williston, *A Treatise on the Law of Contracts* § 601 at 311 (W. Jaeger ed. 1961). If the court, after considering the extrinsic evidence, determines that there is no ambiguity, then the extrinsic evidence must be stricken. *Id.*

4. From the context of the term "at seller's cost" it might be argued that, because the water usage

by Pepcol was to be metered and Pepcol was to pay for the water "so used ... at Seller's cost," the word "cost" refers to the same per gallon rate charged Denver Union by the Denver Water Board. This argument, however, is circular because it assumes the very definition of the term "at seller's cost" that is in issue here. Resort to extrinsic evidence, therefore, is the only method by which the ambiguity can be resolved.

■ The extrinsic evidence clearly established that during 1971 and 1972, the first two years of performance under the contract, Denver Union metered Pepcol's water consumption on an individual basis and assessed Pepcol for water so used at the same per gallon rate as that charged Denver Union by the Denver Water Board. It was only in 1973, after Denver Union became aware that a water loss was occurring somewhere within its system, that it altered its conduct under the contract and began to surcharge Pepcol to compensate itself for the loss. This extrinsic evidence of the performance of the parties under the contract before any controversy arose is indicative of their intent at the time of contracting and was properly considered by the trial court in resolving the meaning of the term "at seller's cost." Because the trial court's resolution of the ambiguity was adequately supported by the evidence, it should not have been reversed by the court of appeals.

The judgment is reversed.

KIRSHBAUM, J., does not participate.