**Ronald N. VANCE, as Trustee under an Indenture dated April 17, 1986, Plaintiff–Appellee,**

v.

**Joseph E. CASEBOLT and Elizabeth Mining and Development, Inc., a Colorado corporation, Defendants–Appellants**

**and**

**NMR, Inc., formerly Noble Metal Recovery, Inc., a Nevada corporation; Technical Services; and Carl W. Martin, Defendants,**

**and**

**Hi–Tech Metal Refiners, a Colorado corporation, Intervenor–Appellant.**

**No. 91CA1790.**

Colorado Court of Appeals, Div. I.

Oct. 8, 1992.

Woodrow, Roushar & Carey, Frank J. Woodrow, Montrose, for plaintiff-appellee Ronald N. Vance.

Aaron R. Clay, Delta, for defendant Technical Services and defendants-appellants Joseph E. Casebolt and Elizabeth Min. and Development, Inc.

Brooks and Brooks, John A. Brooks, Montrose, for intervenor-appellant Hi–Tech Metal Refiners.

No appearance for defendant NMR, Inc.

No appearance for defendant Carl W. Martin.

Opinion by Judge DAVIDSON.

Defendants Joseph E. Casebolt, Elizabeth Mining and Development, Inc. (EMDI) and Hi–Tech Metal Refiners appeal from the judgment on a promissory note in favor of plaintiff Ronald N. Vance, trustee under an indenture dated April 17, 1986, entered after a trial to the court. We affirm in part and reverse in part.

Casebolt developed a secret process for recovering platinum and other metals from used catalytic converters. He established EMDI, a Colorado corporation owned by Casebolt and his family, which operated a pilot plant for research and development of the process.

In 1986, EMDI negotiated for the sale of this plant to defendant NMR, Inc. and, by way of a sales agreement, EMDI conveyed real estate and personal property, including motor vehicles, to NMR. Casebolt became a director and shareholder of NMR in addition to being president and one-fourth shareholder in EMDI. NMR entered into an operating agreement with defendant Technical Services, a company in which Casebolt was a general partner, whereby Casebolt would be in charge of the operation of the plant. In addition, Casebolt executed an exclusive license agreement in which he granted use of the secret recovery process to NMR.

In order to acquire the financing necessary for this venture, NMR executed an indenture agreement with Vance, trustee under the indenture, on April 17, 1986. Under this indenture agreement, NMR was authorized to issue up to $1 million in promissory notes, which notes were to be secured by NMR's personal property. A security agreement was entered into between NMR and Vance and a financing statement for this security agreement was timely filed with the Colorado Secretary of State. All of the promissory notes authorized by the indenture agreement were issued.

Thereafter, NMR defaulted on its obligations to EMDI under the sales agreement. EMDI then instituted a quiet title action on the real property and conducted a private foreclosure sale of the chattels. At the sale, for which Vance received no notice, EMDI reacquired all of the chattels originally sold by it to NMR, as well as all after-acquired personal property which NMR purchased during its period of operation.

Because there remained one unpaid note under the indenture, Vance brought this action against NMR, Casebolt, EMDI, Technical Services, and Carl W. Martin, who had personally guaranteed the note, to enforce the security interest. During the pendency of the lawsuit, EMDI sold the plant to Micron Mining Company (Micron), which then made an in-house transfer of the plant to its affiliate, Hi–Tech. Vance subsequently amended the complaint to include Hi–Tech as a party defendant.

At trial, the trial court determined that the defendants had no perfected security interest in the personal property and that the private sale by EMDI was not effective as to Vance. It also concluded that Vance had a perfected security interest in all the plant's personal property, excluding fixtures. The court then granted judgment to Vance for, *inter alia*, $175,000 on the note and ordered that the secured property be sold at a sheriff's sale to satisfy the indebtedness.

I.

◼ Defendants first contend that the trial court erred by determining that Vance had a security interest in all of the personal property held by the plant at the time

EMDI sold it to Micron. Specifically, although defendants do not dispute that Vance had a perfected security interest in the personal property originally acquired by NMR from EMDI and later acquired by NMR during its months of operation, they argue that personal property acquired by EMDI after the foreclosure sale which was not proceeds of, nor commingled with, NMR's property was not subject to Vance's security interest. We agree.

Security interests in personal property are governed by § 4-9-101, et seq., C.R.S. (1992 Repl.Vol. 2) of the Uniform Commercial Code (UCC). Section 4-9-203, C.R.S. (1992 Repl.Vol. 2) establishes the criteria for a security interest to be enforceable against the debtor or third parties with respect to the collateral and requires that the debtor has signed a security agreement which contains a description of the collateral, has received value, and has rights in the collateral.

A security agreement may provide that any or all obligations covered by the security agreement are to be secured by after-acquired collateral. Section 4-9-204, C.R.S. (1992 Repl.Vol. 2).

Here, it is undisputed that NMR and Vance entered into a valid security agreement on April 17, 1986, in conjunction with their execution of the indenture agreement. As is pertinent here, the collateral secured by that security agreement and described within the agreement includes:

> all of *Debtor's* tangible personal property including, without limitation, all present and future inventory, goods, merchandise, furniture, fixtures, office supplies, motor vehicles, equipment, machinery, *now owned or hereafter acquired,* including, without limitation, the tangible personal property used in the operation of the Debtor's processing facility. (emphasis added)

Accordingly, the parties agree that any property owned by debtor NMR at the time the security agreement was entered into or later acquired by NMR was subject to Vance's enforceable security interest. The parties further agreed during oral argument to this court that property acquired by Micron or Hi-Tech is not subject to Vance's interest. Rather, at issue is personal property which EMDI added to the plant with "new" monies between the time it purchased NMR assets at the foreclosure sale until it sold the plant to Micron. Defendants contend that such property is not subject to Vance's security interest. We agree.

Here, by the language of the security agreement, the secured collateral includes only *debtor's* tangible personal property, "now owned or hereafter acquired." Since under the agreement NMR, and not EMDI, was the debtor, only property owned or later acquired by NMR is subject to the security agreement. It does not include property subsequently acquired by EMDI after foreclosure. *See* § 4-9-203(1)(c), C.R.S. (1992 Repl.Vol. 2).

Vance argues, nonetheless, that *American Heritage Bank & Trust Co. v. O. & E., Inc.,* 40 Colo.App. 306, 576 P.2d 566 (1978), requires a different result. We do not agree.

In *American Heritage,* this court held that a security interest in after-acquired property extends to assets acquired by the debtor after it has changed its name or structure. In that case, a bank had a perfected security interest in certain of debtor's business property. The debtor defaulted and a junior lienor took over the assets and began operating the business. The junior lienor, who agreed to be subject to the bank's security agreement, then formed a wholly owned corporation which began selling original inventory, commingled with new inventory.

In affirming judgment for the bank, the *American Heritage* court held that because the wholly owned corporation was, except in name and structure, identical to the junior lienor, the after-acquired property clauses contained in the bank's security agreement and financing statement covered items added in the operation of the business by the corporation as well as by the junior lienor. The court stated:

> [A] debtor cannot destroy the perfected security interest of a secured party by merely changing its name or corporate

structure, particularly when there is no evidence to indicate that the secured party had any knowledge thereof.

Invoking that principle here, Vance argues that, because of the close relationship between NMR and EMDI, Vance's security interest should extend to property acquired by EMDI after the foreclosure sale in the operation of the plant. Vance does not contend that NMR and EMDI are the same entity. However, he points to the continuing and pervasive role played by Casebolt in both companies in which Casebolt was variously owner, director, and officer of the companies; had full knowledge of the agreements between NMR and Vance; acquired NMR's assets for EMDI after NMR's default without notice to Vance; and continued operation of the plant after that involuntary transfer at the same location until its sale to Micron. Vance argues that, under these facts, and in light of the after-acquired and successor clauses in the security agreement, the trial court was correct to include property later acquired by EMDI as collateral subject to Vance's security interest. We do not agree.

Initially, we note that Vance makes no other claim for recovery, such as unjust enrichment, fraud, or conversion, against EMDI regarding its reacquisition of NMR's assets. Rather, Vance's sole theory is that he should be entitled to reach new property acquired by EMDI under *American Heritage.* However, nothing in that case supports Vance's contention that property later acquired by a separate entity is subject to a security interest in the predecessor's property merely because the successor corporation has a director, officer, and minority shareholder in common with the debtor corporation.

To the contrary, *American Heritage* applies only to successors which are virtually the same entity as the debtor, different only in name or legal structure. *See In re West Coast Food Sales, Inc.,* 637 F.2d 707 (9th Cir.1981) (change in debtor's status from proprietorship to corporation); *Siljeg v. National Bank of Commerce,* 509 F.2d 1009 (9th Cir.1975) (change in debtor's name); *Fliegel v. Associates Capital Co.,*

272 Or. 434, 537 P.2d 1144 (1975) (partnership assets transferred to newly formed corporation); *Inter Mountain Ass'n of Credit Men v. Villager, Inc.,* 527 P.2d 664 (Utah 1974) (debtor absorbed by merger into successor corporation).

To the extent that Vance urges us to extend *American Heritage* to include property of separate entity successors, we decline to do so. The UCC allows a debtor to commit to a secured party only property in which it has rights, § 4–9–203(1)(c). Such security interest applies to proceeds of such property, §§ 4–9–203(4) and 4–9–306, C.R.S. (1992 Repl.Vol. 2), and, in general, continues in that collateral notwithstanding disposition by the debtor, § 4–9–306(2), C.R.S. (1992 Repl.Vol. 2). Thus, under both the UCC and the security agreement, Vance's security interest attaches only to property of EMDI in which NMR had rights, or to the proceeds of such property.

## II.

Defendants next argue that Vance's security interest was unperfected with regard to certain motor vehicles and trailers which were evidenced by certificates of title and, thus, that his interest in such property was subordinate to their interests under § 4–9–301(1)(c), C.R.S. (1992 Repl.Vol. 2). Insofar as such vehicles and trailers were acquired by EMDI after the foreclosure sale and are not proceeds, we have concluded that such property is not subject to Vance's security interest. To the extent that defendants refer to vehicles and trailers acquired by NMR or proceeds thereof, we disagree that Vance's interest is subordinate to defendants' interests.

Section 4–9–301(1), C.R.S. (1992 Repl.Vol. 2) provides that:

[A]n *unperfected* security interest is subordinate to the rights of:

. . . .

(c) In the case of goods, [a] person who is not a secured party and who is a transferee in bulk or other buyer not in ordinary course of business, [to] the extent that he gives value and receives delivery of the collateral *without knowl-*

*edge* of the security interest and before it is perfected. (emphasis added)

Section 42–6–119, C.R.S. (1984 Repl.Vol. 17) requires that, for a security interest in motor vehicles to be perfected, the secured party must note its security interest on the certificate of title. Here, Vance did not comply with this statute, and therefore, his security interest in these vehicles and trailers was unperfected.

However, the trial court found that Casebolt, as a principal in both NMR and EMDI, either knew of the security interest or is presumed to have known. Moreover, Casebolt's undisputed testimony was that Hi-Tech had assumed the obligations under the indenture and the security agreement. Therefore, regardless of whether Vance's security interest in these items was perfected, because the trial court found that NMR and EMDI had actual knowledge of Vance's security interest, his interest is not subordinate to theirs.

### III.

■ Defendants next contend that the debt secured by the indenture and security agreement to Vance was $170,000, not $175,000. They argue that because there is no note for the additional $5,000 in accordance with the requirements of the indenture, that loan was unsecured. On the other hand, Vance argues that the additional $5,000 was clearly a loan under the indenture and, thus, was a secured obligation. We agree with Vance.

Generally, a security agreement is effective according to its terms between the parties, against purchasers of the collateral, and against creditors. Section 4–9–201, C.R.S. (1992 Repl.Vol. 2).

Here, the security agreement defined the "secured obligation" to include all obligations under the notes and all renewals, extensions, and modifications thereof and all obligations of the indenture. The indenture agreement provided for the issuance of secured one-year notes in an aggregate principal amount of $1 million. It also provided the form and the manner of execution of those notes.

It is undisputed that a creditor, B. Ray Anderson, issued checks to NMR for $100,-000 and $70,000 and that NMR executed a $170,000 note to Anderson in accordance with the terms of the indenture. Moreover, one month later Anderson issued another check for $5,000 to NMR. No note for the $5,000 was issued.

However, NMR requested an extension on the $170,000 note, which Anderson agreed to. In the extension, the parties stated the principal amount of the earlier note was $175,000, not $170,000. At trial, Anderson's uncontested testimony was that he, NMR, and Vance intended the $5,000 disbursement to fall under the indenture, as evidenced by its inclusion as part of the note amount in the extension. Moreover, the extension agreement incorporated by reference the terms and conditions of the indenture and was signed by the president of NMR and Anderson.

On this record, the trial court determined that the $5,000 was "clearly loaned to NMR as part of the total loan under [the] promissory note [and] as included in the extension agreement." We infer from this that the trial court found that the parties— NMR, Anderson, and Vance—had modified the note to include the $5,000 advance.

■ A modification of agreement requires mutual consent of parties involved. Such mutual consent may be either explicitly given or inferred from parties' conduct. *Reynolds v. Farber*, 40 Colo.App. 467, 577 P.2d 318 (1978).

Here, the modification was evidenced by the amount stated in the extension agreement which was entered into by Anderson and the president of NMR.

■ Defendants argue, however, that the extension agreement, to the extent that it served as the note for the $5,000, had to be in the form required for notes under the indenture. We disagree.

As has been noted, the original note was in the form required by the indenture and it set forth the rights and obligations of the debtor and creditor. The parties, by means of the extension agreement, extended the due date of the note. The indenture pre-

scribes no particular form for extension agreements. Thus, even though this extension also evidences a modification between the parties of the note amount, it remains an extension agreement and no adherence to any particular form is required.

Supported as they are by this evidence, we will not disturb the trial court's findings on appeal. *Martinez v. Continental Enterprises*, 730 P.2d 308 (Colo.1986).

## IV.

■ Defendants' final contention is that the trial court erred by determining that Vance is entitled to a confidential written report detailing Casebolt's secret process. We disagree.

The record reveals that Casebolt, as licensor, entered into a license agreement with NMR in which Casebolt granted NMR the exclusive right to use his secret platinum recovery process.

That agreement, in pertinent part, provides:

Obligations of Licensor. Licensor [shall], within a reasonable period following the date of this Agreement:
(a) Disclose to Licensee by means of a confidential written report the Process, including chemical lists and engineering and design drawings of equipment and the plant required in the Process.

The agreement further provides:

The exclusive right and license herein granted shall be contingent upon the performance by [NMR] of all of its material obligations as set forth in [the sales agreement and the operating agreement].

Casebolt testified that, although he prepared the report and placed it in NMR's files, he did not show the document to anyone. Also, it is undisputed that NMR defaulted on the sales agreement and, thus, that its license grant terminated.

In its order, the trial court determined that: "[The exclusive license agreement] and the evidence shows that NMR is entitled to a confidential written report of the process involved which would be an item of personal property subject to the indenture and security agreement." Implicit in this determination is the finding that the period during which the plant was operational constituted a "reasonable period" within which Casebolt should have disclosed the process in a report.

Defendants contend that it was error for the court to determine that Vance is now entitled to the report. Specifically, they argue that any entitlement NMR might have had to the report terminated along with the license. Moreover, they assert that NMR's breach precludes its right to demand specific performance.

First, insofar as defendants argue that NMR did not become entitled to the report, we disagree.

■ A contract must be construed to ascertain and effectuate the mutual intent of the parties. *Pepcol Manufacturing Co. v. Denver Union Corp.*, 687 P.2d 1310 (Colo.1984). The parties' intent is determined primarily from the language of the instrument itself. *In re May*, 756 P.2d 362 (Colo.1988).

Here, the licensing agreement required Casebolt to disclose the process by means of a written report "within a reasonable period" following the execution of the agreement. The trial court, with record support, determined that Casebolt had a reasonable period within which to comply. Therefore, we conclude that under the contract, NMR became entitled to a written report of the process.

■ Secondly, we disagree that NMR's default on the sales agreement and the subsequent termination of the license altered that right. Defendants correctly state that, in general, a party who substantially breaches a contract may not seek specific performance. *See Scientific Packages, Inc. v. Gwinn*, 134 Colo. 233, 301 P.2d 719 (1956). However, we disagree with defendants' characterization of NMR's default on the sales agreement as a breach of the licensing agreement.

Initially, we note that a licensing agreement, by its nature, can create rights and obligations that are perpetual. Moreover,

the term of a license contained in a licensing agreement is distinct from the term of the licensing agreement itself. *See* R. Milgrim, *Business Organizations: Milgrim on Trade Secrets* § 12.18[1][a] (1991) (license term is distinct from term of agreement).

Here, the licensing agreement, in addition to granting NMR an exclusive license, set forth numerous other rights and duties of the parties and included provisions relating to the protection of secrecy of the process. In contrast to the fact that the license grant itself was contingent upon NMR's performance of the sales agreement, the term of the licensing *agreement* "continue[d] in perpetuity."

Thus, as we read the agreement, NMR's default was merely a failure to meet a contingency of the license grant and resulted in NMR's exclusive use of the process being terminated. It did not invalidate the remainder of the agreement.

Moreover, nothing in the licensing agreement supports defendant's assertion that NMR's entitlement to the report, once it existed, ceases. The licensing agreement has no requirement that trade secret materials were to be returned to Casebolt upon the termination. *See* Z. Cavitch, *Business Organizations* § 240.06[13] (1991). Thus, under the contract, NMR's entitlement to the report is unaffected by the termination.

The judgment is affirmed in part and reversed in part, and the cause is remanded to the trial court for further proceedings not inconsistent with this opinion.

NEY and BRIGGS, JJ., concur.