United States Court of Appeals
Fifth Circuit

**F I L E D**

December 27, 2004

Charles R. Fulbruge III
Clerk

In the

# United States Court of Appeals
## for the Fifth Circuit

_____

m 03-11341

_____

RHONDA SANCHEZ,

Plaintiff-Appellee,

VERSUS

VERIO INC., ET AL.,

Defendant,

VERIO INC.,

Defendant-Appellant,

_____

Appeal from the United States District Court
for the Northern District of Texas
m 3:01-CV-972-N

_____

Before JONES, SMITH, and STEWART,
    Circuit Judges.

JERRY E. SMITH, Circuit Judge:[*]

A jury returned a verdict in favor of Rhonda Sanchez, finding that her former employer, Verio Inc. ("Verio"), breached its contractual obligation to vest her stock options fully on her termination. Verio appeals, contending that the stock-option agreement unambiguously requires a condition not present in Sanchez's case before triggering accelerated vesting, and thus the district court erred in submitting the case to the jury. We agree. Because the agreement unambiguously does not require accelerated vesting in Sanchez's circumstances, we reverse and render judgment in favor of Verio.

I.

Sanchez was employed by Verio, an internet service provider, from February 1998 until she was terminated in April 2000. At four points during her employment, she received stock options from Verio. Each time that occurred, she was provided with and signed a "Notice of Stock Option Award" ("Notice") that together with the "Stock Option Agreement" ("Agreement") sets forth the terms and conditions governing the vesting, exercise, and expiration of the options.

According to the general vesting schedule in the Notice, Sanchez's stock options vested at a rate of twenty-five percent per year, beginning one year after issuance, with each award fully vesting in four years provided that

Sanchez remained employed by the company. Pursuant to § 2(a) of the Agreement, however, this general vesting schedule was subject to the provisions of § 4. Section 2(a) provides:

Right to Exercise. The Option shall be exercisable during its term in accordance with the Vesting Schedule set out in the Notice and the applicable provisions of the Plan and this Option Agreement. The Option shall be subject to the provisions of Section 4, below, relating to the exercisability or termination of the Option upon a corporate event.

Section 4, captioned "Corporate Transactions/Changes in Control/Related Entity Dispositions," enables, in its three subsections, the accelerated vesting of stock options in certain enumerated (and here contested) circumstances. The relevant part of § 4SSthe provision at the center of this disputeSSis § 4(b), which states,

The Option shall become fully vested and exercisable upon termination of the Continuous Status as an Employee, Director or Consultant of the Optionee if such Continuous Status as an Employee, Director or Consultant is terminated by the Company or a Related Entity without Cause or voluntarily by the Optionee with Good Reason within twelve (12) months of a Change in Control.

The issue on appeal is whether Verio breached an obligation to vest Sanchez's options fully on her termination pursuant to this provision.

During her tenure, Sanchez received grants of options to purchase more than 40,000 shares of Verio common stock. As of the date of her termination (April 26, 2000), 11,290 of

[*] Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

her options had vested, and 29,250 were unvested. At the time she was terminated, Verio was engaged in merger negotiations with NTT Communications, Inc. ("NTT"). After regulatory approval, the NTT/Verio merger was executed on August 31, 2000, more than four months after Sanchez was terminated.

Having been terminated holding nearly 30,000 unvested options, Sanchez contacted the company seeking to exercise all her options by invoking the accelerated vesting provision in § 4(b). Specifically, she claimed that the company's merger with NTT constituted a "change in control" (as defined by the Agreement) occurring within twelve months of her termination without cause, thereby triggering Verio's duty under § 4(b) to vest all her options fully. Verio refused, informing Sanchez that she did not qualify for accelerated vesting under § 4(b) because she had been terminated before the merger.

## II.

Sanchez sued in state court alleging that Verio had breached its contractual obligation to provide for accelerated vesting. Verio removed the case to federal court based on diversity of citizenship. The parties filed cross-motions for summary judgment in which each contended that the Agreement unambiguously reflected its own interpretation of § 4(b).

Finding the Agreement to be susceptible to more than one interpretation, the district court denied both motions and set the cause for trial. After a four day trial, the jury returned a verdict for Sanchez. Having found that Verio "failed to comply" with the stock option agreement, the jury awarded Sanchez damages

of $1,945,000.[2]

Verio's primary contention is that the court erred in finding the Agreement ambiguous and thus erred in submitting the case to the jury. Beyond this threshold challenge, Verio also questions the sufficiency of the evidence; the use of a general verdict form, as opposed to special interrogatories; and the refusal to instruct the jury to interpret § 4(b) in light of the entire Agreement.

## III.

The determination of whether a contract is ambiguous is a question of law subject to *de novo* review. *See, e.g.*, *Stinnett v. Colo. Interstate Gas Co.*, 227 F.3d 247, 254 (5th Cir. 2000); *Ad Two, Inc. v. City & County of Denver*, 9 P.3d 373, 376 (Colo. 2000). Pursuant to a choice of law provision not contested by either party, we apply Colorado law to determine whether the Agreement is ambiguous.[3] "Written contracts that are complete and free from ambiguity will be enforced according to their plain language." *Ad Two*, 9 P.3d at 376 (citing *USI Props. E., Inc. v. Simpson*, 938 P.2d 168, 173 (Colo. 1997)). If, however, we determine that the Agreement is ambiguous, "its interpretation becomes an issue of fact for the trial court to decide in the same manner as other disputed factual issues." *Pepcol Mfg. Co. v. Denver Union Corp.*, 687 P.2d 1310, 1314 (Colo. 1987) (quoting *Union Rural Elec.*

---

[2] The court also awarded prejudgment interest of $545,611.12.

[3] Section 13 provides that the Agreement and Notice "are to be construed in accordance with and governed by the internal laws of the State of Colorado without giving effect to any choice of law rule that would cause the application of the laws of any jurisdiction other than the internal laws of the State of Colorado to the rights and duties of the parties."

3

*Ass'n v. Pub. Util. Comm'n*, 661 P.2d 247, 251 (Colo. 1983)).

## IV.
### A.

Verio contends that § 4(b) unambiguously provides that if an employee is terminated without cause,[4] accelerated vesting is triggered *only* if the termination occurred in the twelve-month period *after* a corporate change in control. Because Sanchez was terminated more than four months before the corporate change in control was executed, Verio claims it had no obligation to vest her options fully upon her termination and that Verio is therefore entitled to judgment as a matter of law.

Sanchez disagrees. She offers two interpretations of § 4(b), either of which she claims supports the finding of ambiguity, and thus supports the decision to submit this case to the jury. Sanchez first contends that § 4(b) requires accelerated vesting upon her termination without cause regardless of the occurrence of any corporate event. In other words, contrary to Verio's interpretation that § 4(b) is a so-called "double-trigger" (*i.e.*, accelerated vesting only upon *both* termination without cause *and* termination within twelve months of a change in control), Sanchez contends that § 4(b) is a "single-trigger" (*i.e.*, accelerated vesting upon termination without cause).

According to this single-trigger theory, the change in control provision of § 4(b) does not modify the termination without cause provision; instead, the Agreement provides for accelerated vesting "*either* if she was terminated 'without Cause,' *or* she quit 'with Good

Reason within twelve (12) months of a Change in control.'" Under this interpretation, Sanchez is entitled to accelerated vesting based solely on the jury's factual finding that she was terminated without cause.

Alternatively, Sanchez contends that even if § 4(b) is unambiguously a double-trigger (requiring both termination without cause and termination within twelve months of a change in control), the Agreement is nonetheless ambiguous because it is uncertain whether the term "within" requires a change in control to precede the termination or whether, instead, it can follow a termination. Sanchez asserts that "[n]othing about the plain meaning of 'within' indicates or requires that termination occur specifically *after* a 'Change in Control.'" And because Sanchez was terminated only four months before a change in control did in fact occur, she contends that there is a fact question whether her options should have vested on an accelerated basis given that "her termination took place '*within*' twelve (12) months of a Change in Control."

### B.

Under Colorado law, "[t]he meaning of a contract is found by examination of the entire instrument and not by viewing clauses or phrases in isolation." *Kuta v. Joint Dist. No. 50(J)*, 799 P.2d 379, 392 (Colo. 1992).[5] "In determining whether a contractual provision is ambiguous, the instrument's language must be

---

[4] Verio does not challenge on appeal the jury's implicit finding that Sanchez was terminated without cause.

[5] *See also Pepcol*, 687 P.2d at 1314 ("An integrated contract in the first instance is to be interpreted in its entirety with the end in view of seeking to harmonize and give effect to all provisions . . . ."); *Bevsek v. Huerfano Sch. Dist.*, 728 P.2d 325, 326 (Colo. App. 1986) ("[A] contract must be construed as a whole, and each provision must be given effect.").

examined and construed in harmony with the plain and generally accepted meaning of the words used, with reference to all of the agreement's provisions." *Fiberglass Fabricators, Inc. v. Kylberg*, 799 P.2d 371, 374 (Colo. 1990). "Of course, 'the mere fact that parties differ on their interpretations does not of itself create an ambiguity.'" *Dorman v. Petrol Aspen*, 914 P.2d 909, 912 (Colo. 1996) (citing *Fiberglass Fabricators*, 799 P.2d at 374). Instead, "[t]erms used in a contract are ambiguous when they are susceptible to more than one *reasonable* interpretation." *Ad Two*, 9 P.3d 373 at 376 (emphasis added).

Despite this interpretive canon requiring interpretation of a contract in its entirety, the district court focused on § 4(b) in isolation. Specifically, the court, in its written opinion denying summary judgment, reasoned as follows:

> Section 4(b) of the Agreement includes an 'or' that separates two clauses, but the term 'Change of Control' is included only in the second clause. It is possible the parties intended for the 'Change of Control' to apply to both clauses or just to the latter clause, so the Agreement is susceptible to more than one meaning, and it is ambiguous.

When read in isolation, § 4(b) can indeed be said to be ambiguous: It is not unreasonable to read the "within twelve (12) months of a change in control" clause of § 4(b) as modifying *both* the termination without cause provision and the voluntarily with good reason provision; similarly, it is not unreasonable to read the "within twelve (12) months of a change in control" clause as modifying *only* the voluntarily with good reason provision. But Colorado contract law, as well as the

common law of contracts generally, requires courts to determine ambiguity by reference to all provisions of an instrument.[6]

When read in context of the Agreement as a whole, § 4(b) may still be susceptible to more than one interpretation, but in context it is no longer susceptible to more than one *reasonable* interpretation.[7] Read in light of the entire Agreement, the provision is unambiguous: Before triggering accelerated vesting, it requires (1) both termination without cause and termination within twelve months of a change in control (*i.e.*, it is a double-trigger); and (2) termination without cause to occur within the twelve-month period *after* a change in control.

1.

On the threshold interpretive question (namely, whether § 4(b) triggers accelerated vesting merely on termination without cause, or whether it requires termination without cause within twelve months of a change in

---

[6] *See, e.g.*, *Dorman*, 914 P.2d at 912 (stating that courts should determine ambiguity by reference to plain language "with reference to all of the agreement's provisions"); *see also* AMERICAN JURISPRUDENCE, CONTRACTS § 331 (2d ed. 2004) ("When deciding whether an agreement is ambiguous, particular words should be considered, not as if isolated from the context, but in the light of the obligation as a whole . . . ."); *id.* ("To determine contract ambiguity, a court looks to the entirety of the contract."); WILLISTON ON CONTRACTS § 30.5 ("In determining whether a contract is ambiguous, the court begins with its plain language . . . with reference to all of the agreement's provisions.").

[7] *See Ad Two*, 9 P.3d at 376 ("Terms used in a contract are ambiguous when they are susceptible to more than one *reasonable* interpretation.") (emphasis added).

5

control) the reasonableness of Sanchez's single-trigger interpretation is belied by various other provisions in the Agreement. Section 2(a), governing Sanchez's "Right to Exercise," expressly classifies § 4 as dealing with corporate events:

> Right to Exercise. The Option shall be exercisable during its term in accordance with the Vesting Schedule set out in the Notice and the applicable provisions of the Plan and this Option Agreement. *The Option shall be subject to the provisions of Section 4, below, relating to the exercisability or termination of the Option upon a corporate event.*

(Emphasis added.) Thus, § 2(a) indicates that § 4's three accelerated vesting provisions are operative on the occurrence of a "corporate event."

The Agreement defines "Corporate Event" in § 3(d) to mean "the occurrence of a Corporate Transaction, Change in Control or Related Entity Disposition." Given this tripartite definition, § 4, captioned "Corporate Transactions/Changes in Control/Related Entity Dispositions," is structured accordingly: It provides a separate subsection providing for accelerated vesting on the occurrence of each one of these three corporate events—corporate transaction (§ 4(a)), change in control (§ 4(b)), and related entity disposition (§ 4(c)).[8]

Despite this structure and the operative role of corporate events, Sanchez's interpretation requires one to read § 4(b)—the subsection dealing specifically with changes in corporate control, itself in the middle of a section dealing with corporate events generally—as fortuitously also including a general provision for full vesting where an employee is terminated without cause, regardless of any corporate event generally, much less a corporate change in control specifically. This is not a reasonable interpretation of the Agreement.

Moreover, the application of § 2(a) renders unreasonable Sanchez's single-trigger theory. Section 2(a) provides that the vesting schedule set forth in the Notice—25% per year, beginning one year after issuance—is subject to § 4's accelerated vesting provisions. But the general vesting schedule set forth in the Notice is not subject to § 4's accelerated vesting provisions as a general matter; instead, it is subject to § 4's accelerated vesting provisions "upon a corporate event."

In other words, Sanchez's options vest pursuant to the Notice at the standard rate of 25% per year, beginning one year after issuance, unless the provisions of § 4 "relating to the exercisability or termination of the Option upon a corporate event" are applicable. San-

---

[8] This point is not intended to take meaning from the title heading of § 4, because the Agreement specifically provides, in Section 14, that "[t]he captions used in the Notice and this Options Agreement are inserted for convenience and shall not be deemed a part of the Option for construction or interpretation." Instead, the point is intended to demonstrate the general problem with Sanchez's
(continued...)

[8](...continued)
single-trigger theory: It requires one to ignore the structure of the Agreement by reading a general termination without cause vesting provision into the middle of a sub-section dealing with changes in corporate control. Even further, Sanchez's single-trigger theory requires this reading notwithstanding multiple other provisions treating § 4 as dealing with corporate events.

chez's single-trigger theory, however, requires precisely the opposite: accelerated vesting upon termination according to § 4SSas opposed to normal vesting pursuant to the NoticeSSwithout a corporate event. Here again, Sanchez's interpretation is not reasonable.

Section 4(d) provides further support for Verio's position that the Agreement is unambiguously a double-trigger. That subsection, which addresses tax implications related to accelerated vesting of options, provides, in part:

> The portion of the Option, if an Incentive Stock Option, accelerated under this Section 4 *in connection with a Corporate Event* shall remain exercisable as an Incentive Stock Option under the Code only to the extent the $100,000 dollar limitation of Section 422(d) of the Code is not exceeded.

(Emphasis added.) As with § 2(a), § 4(d) characterizes acceleration under § 4 as occurring "in connection with a Corporate Event" and not, as Sanchez's single-trigger theory would have it, with termination without cause in and of itself.[9]

In light of these other provisions, Sanchez

---

[9] Sanchez attempts to refute any implication from § 4(d) by contending that it was not intended to address "all possible accelerated vesting situations." Sanchez does not, however, explain why this provision dealing with tax issues related to accelerated vesting would apply to all of § 4 by its own terms, save her situation; nor, for that matter, does Sanchez identify any other provision of the Agreement that would address tax implications associated with accelerated vesting in a termination without cause scenario not associated with a corporate event.

attempts a global effort to render illegitimate any reference to other provisions of the Agreement when deciding the threshold ambiguity question. To this end, Sanchez repeatedly asserts in her brief that reference to other provisions of the Agreement proves *a priori* that the Agreement is ambiguous. This is incorrect as a matter of law.

Reference is not made to other provisions of the Agreement because a conclusion has been made (explicitly or implicitly) that § 4(b) is ambiguous; rather, such reference is made to give meaning to the terms of § 4(b). "The meaning of a contract is found by examination of the entire instrument and not by viewing clauses or phrases in isolation." *Kuta*, 799 P.2d at 392.

In sum, when read in context of the entire Agreement, § 4(b) unambiguously requires both termination without cause and termination within twelve months of a change in control before triggering accelerated vesting. Thus, as a matter of law, Verio is not obligated to vest, on an accelerated basis, Sanchez's options solely on her termination without cause.

2.

The second interpretive question is whether § 4(b) provides for accelerated vesting where an employee is terminated without cause *before* a corporate change in control, or whether it requires termination without cause *after* a change in control. Sanchez's alternative reading of the Agreement, which concedes that § 4(b) is a double-trigger (requiring both termination without cause and termination within twelve months of a change in control), claims that the contract is still ambiguous, and thus the case was properly submitted to the jury, because it is uncertain whether the term

7

"within" requires a change in control to precede the termination or whether it can follow a termination. And given her termination four months before a change in control occurred, Sanchez maintains that there is a fact question whether Verio breached its obligation to accelerate the vesting of her options.

At many different levels, Sanchez's double-trigger interpretation of § 4(b)SStermination may occur *either* in the twelve months before or after a corporate change in controlSSis so obviously a post-hoc invention of her lawyers that it bears no relation to the rest of the Agreement. Pursuant to the express terms of the Agreement, if an employee is terminated before a change in control, any unvested options expire immediately upon termination. Section 7 expressly provides that "to the extent the Optionee was not entitled to exercise the Option on the Termination Date . . . the option shall terminate." As a result, when the second trigger occursSSthe corporate change in controlSSthere are no options remaining to accelerate.

The Notice merely provides that "the Optionee acknowledges and agrees that the shares subject to the Option shall vest, if at all, only during the period of the Optionee's continuous status as an employee." The Notice therefore expressly proscribes post-termination vesting of options. It follows that a change in control occurring after an employee is terminatedSSthe second triggerSScannot operate to vest options in an employee who has previously been terminated; options must vest, "if at all," only during the "Optionee's continuous status as an employee."

Sanchez attempts to avoid this result by arguing that the options of an employee termi-nated without cause do, in fact, vest at termination "even if at that time it was not yet known whether the options would be accelerated." Sanchez purports to find support for this argument by quoting § 4(b) in her brief as follows: "The Option shall become fully vested and exercisable upon termination . . ." From this Sanchez contends that § 4(b) provides for the immediate vesting and exercisability of a terminated employee's options, "subject to the contingency that a Change in Control occurs within twelve months after the termination."

This self-styled "retroactive" or "contin-gent" vesting theory, which attempts to avoid the expiration mandated by the clear terms of § 7 and the Notice, is demonstrably incorrect. Putting aside the absence of any provisions in either the Agreement or the Notice that speak to such retroactive or contingent vesting,[10] § 4(b) does not, as Sanchez claims, provide for options to become fully vested and exercisable on termination; it provides (in the portion replaced by Sanchez with an ellipsis) that options become fully vested on termination if the employee is terminated within twelve months of a change in control. It therefore follows as a matter of logic that (1) because the options must vest, if at all, before termination and (2) they vest on an accelerated basis only on a change in control, then (3) the

---

[10] In fact, Sanchez concedes in a footnote that "[t]he Agreement does not spell out the logistics of the purchase of shares subject to such an acceler-ated vesting contingency, but such logistics could be handled any number of ways." Indeed, such lo-gistics could be handled any number of ways. The trouble here, of course, is that the plain terms of the Agreement indicate that the absence of such logistics is not an oversight, but, rather, is the consequence of an Agreement that does not provide for such retroactive vesting.

change in control must occur *before* the termination. Because Sanchez was terminated more than four months before the change in control, Verio is not, as a matter of law, obligated to vest her options fully.

### 3.

Sanchez tries to demonstrate that the Agreement is ambiguous by pointing to experts. She relies on the testimony of two law professors familiar with stock option agreements and other forms of contingent equity compensation: The first stated that "virtually all" of the other stock option agreements he had reviewed provided for full vesting upon termination without cause; the second testified to an "industry custom" of providing for the exercisability of stock options on termination without cause, opining that "in such circumstances" a change in control "is not a condition to the vesting of compensation."

Sanchez may not, however, establish ambiguity by reference to such testimony: "Extrinsic evidence of intent is relevant only if, after examination of the entire instrument, the terms are ambiguous." *Union Rural Elec.*, 661 P.2d at 251.[11] "Absent such ambiguity, we will not look beyond the four corners of the agreement to determine the meaning intended by the parties." *Ad Two*, 9 P.3d at 376–77.

---

[11] *See also Kuta*, 799 P.2d at 382 ("Extrinsic evidence is only admissible to prove intent where the terms of a contract are ambiguous."); *Pepcol*, 687 P.2d at 1314 ("It is axiomatic that in the absence of an ambiguity a written contract cannot be varied by extrinsic evidence."); *id.* ("It is only where the terms of an agreement are ambiguous or are used in some special or technical sense not apparent from the contractual document itself that the court may look beyond the four corners of the agreement to determine the meaning intended by the parties.").

Because we have determined as a threshold matter that the Agreement is unambiguous, Sanchez cannot establish ambiguity on the basis of this extrinsic evidence.

### V.

In sum, we do not doubt that Sanchez's lawyers presented a compelling story to the jury: She was fired without cause before the merger was executed so the company could avoid payment of her stock options. Whatever the merits of this story, it may not serve to defeat conditions expressed in unambiguous terms in the governing instrument. Because the Agreement plainly requires termination without cause within the twelve-month period after a corporate change in control, and the undisputed circumstances of Sanchez's termination do not satisfy these conditions, Verio is entitled to judgment as a matter of law.[12] The judgement is REVERSED, and judgment is RENDERED in favor of Verio.

---

[12] Because Verio is entitled to judgment as a matter of law, we need not address its additional arguments on appeal.