23CA1512 Havana v JERB 07-10-2025

COLORADO COURT OF APPEALS

---

Court of Appeals No. 23CA1512
City and County of Denver District Court No. 21CV33157
Honorable J. Eric Eliff, Judge

---

Havana Operator, LLC, a Colorado limited liability company, and 51st Property Management Group, LLC, a Colorado limited liability company,

Plaintiffs-Appellants,

v.

JERB Limited, a Colorado limited liability company,

Defendant-Appellee.

---

JUDGMENT AFFIRMED

Division I
Opinion by JUDGE WELLING
Schock and Berger*, JJ., concur

**NOT PUBLISHED PURSUANT TO C.A.R. 35(e)**
Announced July 10, 2025

---

Wysocki Law Group, P.C., Jeremy S. Wysocki, Zachary Crow, Denver, Colorado, for Plaintiffs-Appellants

Holland & Hart LLP, Matthew J. Smith, Nicholas W. Katz, Denver, Colorado, for Defendant-Appellee

*Sitting by assignment of the Chief Justice under provisions of Colo. Const. art. VI, § 5(3), and § 24-51-1105, C.R.S. 2024.

¶ 1    Plaintiffs, Havana Operator, LLC (Havana) and 51st Property Management Group, LLC (51st Property), appeal the trial court's entry of judgment against them in their breach of contract action against defendant, JERB Limited (JERB).  We affirm.

## I.    Background

### A.    Factual Background

¶ 2    Havana owned state and local marijuana cultivation licenses that allowed for the cultivation of marijuana at a unit located on East 101 Avenue (Unit 101).  51st Property held the commercial leasehold interest for Unit 101 and Havana subleased Unit 101 from 51st Property.  51st Property leased the location from 51st Montebello, LLC (the Landlord).  Although Unit 101 was licensed for marijuana cultivation, the plaintiffs only used the space for storage.  51st Property's lease with the Landlord was set to expire in April 2023 and contained a three-year renewal option.

¶ 3    On March 4, 2021, JERB sent Havana a letter of intent for an asset purchase agreement (APA) that contemplated JERB's purchase of Havana's marijuana cultivation licenses for Unit 101 and the remainder of 51st Property's leasehold interest in Unit 101.  In this letter of intent, JERB stated that its obligation to close the

proposed transaction was conditioned on "a new lease for [Unit 101] on terms satisfactory to [JERB]," among other things.

¶ 4    On March 24, 2021, the plaintiffs and JERB entered into the APA. In the APA, JERB agreed to purchase the remainder of 51st Property's leasehold interest in Unit 101 and the corresponding marijuana cultivation licenses from Havana. But the APA conditioned closing on the execution of an assignment and assumption agreement for Unit 101 and final governmental approval — both state and local — for a change in ownership to the marijuana cultivation licenses.

¶ 5    Section 4 of the APA provided as follows:

> At Closing, [JERB] and 51st Property shall enter into an assignment and assumption agreement in a form to be agreed upon by Landlord, 51st Property, and [JERB] (the *"Assignment and Assumption Agreement"*) whereby the Leasehold Interest and all other rights and obligations of 51st Property under the Lease Agreement shall be assigned by 51st Property to [JERB] and shall be assumed by [JERB]. 51st Property represents and warrants that the Leasehold Interest shall be free and clear of any and all Liens and shall be in good standing and not in default as of April 1, 2021[,] and as of Closing.

¶ 6    Section 3 of the APA required JERB to make periodic payments into an escrow account toward the purchase price for the assets contemplated by the APA and the rent accruals on Unit 101 between April 11, 2021, and the closing date.  Section 11 of the APA allowed JERB to conduct a due diligence investigation of Unit 101, including building inspections.  Under section 17 of the APA, JERB could terminate the agreement if final governmental approval wasn't granted within six months of the March 24, 2021, effective date.

¶ 7    The plaintiffs drafted the language of the APA, including section 4.

¶ 8    At the time that the parties entered into the APA, JERB intended to use Unit 101 for marijuana cultivation and needed to invest approximately $2.5 million into the space to bring it into compliance with local and state codes and make it suitable for its intended use.  While Unit 101 had two grow rooms that could be used immediately, JERB's anticipated build-out was expected to take four to five months for design and permitting, and another six months for construction.  Given JERB's contemplated investment and improvement to Unit 101, JERB wanted a longer lease term than the three-year option to extend that 51st Property currently

3

held. Havana understood that JERB and the Landlord would negotiate terms of a lease extension. 51st Property understood that nothing in the APA, including section 4, prevented JERB from seeking an extension of the lease once the lease had been assigned to JERB. Nor did the APA expressly prevent JERB from seeking an extension as part of the assignment.

¶ 9 Within days of executing the APA, JERB reached out to the Landlord to start negotiating a lease term extension as part of the assignment. JERB also communicated to the Landlord its hope that the Landlord would reduce the rent for an initial period of the extended lease given JERB's anticipated investment in improving Unit 101. The Landlord seemed open to discussing a lease term extension with JERB but communicated to JERB that it wouldn't agree to an assignment of the current lease on Unit 101 until 51st Property became current on rent and paid the approximately $120,000 balance owed.

¶ 10 While JERB and the Landlord began negotiating the lease term for the assignment of Unit 101, JERB and Havana worked together to submit a change of ownership application to the Colorado Marijuana Enforcement Division (MED) for Unit 101's marijuana

4

cultivation licenses. In the application to the MED, the parties included a letter of conditional consent for the lease assignment from the Landlord, stating that the assignment of the lease for Unit 101 was contingent on the Landlord and JERB coming to "mutually agreeable terms for any contemplated extension of the Lease Agreement." JERB sent a copy of this letter to Havana on March 31, 2021.

¶ 11     On April 1, 2021 — the day the APA provided that 51st Property would be "in good standing and not in default" on Unit 101 — 51st Property owed $128,000 in unpaid rent.

¶ 12     On April 27, 2021, the MED conditionally approved Havana and JERB's change in ownership application contingent on two things: (1) the parties' agreement on an effective date for the change in ownership to take place and (2) local approval.

¶ 13     On May 7, 2021, the Landlord told 51st Property that it couldn't agree to a lease assignment with JERB for Unit 101 because 51st Property still owed past due rent. That same day, the Landlord told JERB the same thing.

¶ 14     On May 13, 2021, 51st Property came current on its unpaid rent to the Landlord.

¶ 15 On May 18, 2021, Havana and JERB received conditional local approval contingent on the parties' ability to provide a copy of a lease or lease assignment reflecting that JERB legally possessed Unit 101.

¶ 16 In mid-June 2021, the Landlord emailed 51st Property and JERB and asked if the parties could connect to help facilitate "the heavily negotiated lease assignment." On June 30, 2021, Landlord asked Havana and 51st Property to participate in the lease negotiations with JERB to help facilitate the assignment.

¶ 17 Thereafter, 51st Property and the Landlord executed an assignment and assumption agreement that didn't include terms for a lease extension or rent abatement. 51st Property sent the executed assignment and assumption agreement to JERB, which was the first proposed assignment and assumption agreement JERB had received after months of negotiations with the Landlord. JERB immediately responded and explained that the proposed agreement wasn't in a form it could agree to and that it sought "rent relief" as part of the assignment and assumption agreement. JERB referred to the Landlord's previous representations — including the representation that the Landlord made to the MED in the change in

6

ownership application — that any assignment of Unit 101 was contingent on a contemplated extension of the lease. JERB also stated that it was "willing to be completely creative in getting to a place where all the parties can agree" on the assignment and assumption agreement.

¶ 18 JERB and the Landlord continued to negotiate the assignment of Unit 101 for three more months. But JERB and the Landlord disagreed on terms, including the rental rate for the contemplated fifteen-year extended lease. Around this time, JERB exercised its right to perform a due diligence inspection of Unit 101. This inspection revealed significant damage that required costly repairs as well as "excessive microbial growth" and "possible mold growth" in the drywall, increasing JERB's anticipated investment into Unit 101 improvements.

¶ 19 On September 14, 2021, JERB made its final lease extension counteroffer to Landlord and explained that the offered terms were based on changes to the local marijuana market, including "over supply [and] shaky market fundamentals," as well as an increased cost of construction to Unit 101. The Landlord responded with a counteroffer on September 27, 2021. JERB declined Landlord's

counteroffer and terminated further negotiations with the Landlord regarding the lease extension for Unit 101. JERB then refused to sign the assignment and assumption agreement that 51st Property had sent three months prior. Consequently, state and local authorities never granted final governmental approval for a change in ownership to Unit 101's marijuana cultivation licenses within the six months provided for under the APA.

¶ 20    On September 28, 2021, JERB notified the plaintiffs that it was exercising its right to terminate the APA under section 17. Over the course of its negotiations with the Landlord, JERB had paid $820,867.04 into the escrow account and promptly sought return of the funds per section 3 of the APA after it terminated the APA. The plaintiffs refused to approve the return of the escrow funds to JERB.

## B.    Procedural History

¶ 21    The plaintiffs sued JERB for breach of contract, including alleging JERB breached its duty of good faith and fair dealing under the APA, and asserted the equitable claims of promissory estoppel and unjust enrichment. JERB countersued, alleging, among other things, that the plaintiffs breached the APA by preventing the

return of the escrow funds to JERB[1] and breached their duty of good faith and fair dealing. The parties filed cross-motions for summary judgment. The trial court determined that the issue of whether JERB breached its duty of good faith and fair dealing during negotiations of the assignment was still a disputed issue of material fact and denied both summary judgment motions as to that issue.

¶ 22    Of particular import to our analysis, the trial court noted the following undisputed facts in its order: (1) during negotiations of the APA, JERB communicated to both 51st Property and Havana its intent to negotiate a new lease or lease extension with the Landlord as part of the transaction contemplated by the APA; (2) on the date the parties executed the APA, JERB emailed Havana referencing its desire to either take over the existing lease "via assumption or negotiate a net new lease" with the Landlord; (3) for JERB and Havana to obtain final governmental approval for the change in

---

[1] The trial court held an evidentiary hearing on February 16, 2022, to narrowly decide the issue of whether JERB was entitled to the return of the escrow funds. After hearing the evidence, the trial court concluded that JERB was entitled to the return of the escrow funds and ordered that the escrow agent return the escrow funds to JERB on March 4, 2022.

ownership to the marijuana cultivation licenses, JERB and the Landlord had to mutually agree on a contemplated lease extension and 51st Property and Havana knew that these negotiations were ongoing; and (4) the due diligence inspection report created a large issue in JERB's assessment of the viability of using Unit 101 as contemplated.

¶ 23　Although the trial court ultimately concluded that the APA unambiguously provided JERB the discretion to reject an assignment and assumption agreement that didn't include a lease extension, it sent the plaintiffs' breach of contract claim to trial to determine whether JERB breached its duty of good faith and fair dealing under the APA when it did just that.  After a five-day jury trial, the jury returned a verdict against the plaintiffs on their breach of the duty of good faith and fair dealing claim and in favor of JERB on its counterclaim, awarding JERB one dollar in nominal damages.  The plaintiffs appeal; JERB doesn't.

## II.　Analysis

¶ 24　On appeal, the plaintiffs contend that the trial court erred by (1) relying on extrinsic evidence to conclude that the APA unambiguously gave JERB discretion to reject an assignment and

assumption agreement that didn't include a lease extension; (2) barring evidence that JERB expressly breached two provisions of the APA — namely, sections 10(c) and 16(b) — for lack of relevance; (3) referring to the plaintiffs' counsel as "disingenuous" in front of the jury; (4) advocating for JERB by offering the basis for evidentiary objections in front of the jury; and (5) instructing the jury that the plaintiffs' conduct was "wrongful." The plaintiffs preserved issues (1) and (2) but issues (3) through (5) are unpreserved.

¶ 25    We address, and reject, each of the plaintiffs' contentions in turn.

### A. Whether Section 4 of the APA Unambiguously Required JERB to Assume the Lease

¶ 26    The plaintiffs first contend that the APA unambiguously required JERB to assume the lease on Unit 101 and the trial court therefore erred by determining that section 4 of the APA unambiguously gave JERB the discretion to "refuse an assignment that did not include an extension" and erroneously relied on extrinsic evidence to do so. We agree with the plaintiffs that the trial court erroneously concluded that the APA was unambiguous,

11

but we conclude that summary judgment was nevertheless proper because the undisputed evidence regarding the parties' conduct surrounding the making of the APA and under the APA supports the conclusion that a lease extension was part of the "form [of the assignment and assumption agreement] to be agreed upon" by the parties. Thus, though on different grounds, we conclude that the trial court correctly determined that the APA required the parties' agreement on the terms of the lease as a prerequisite to closing.

1. Standard of Review and Applicable Legal Principles for Contract Interpretation

¶ 27     "We review questions of contract interpretation de novo." *Gagne v. Gagne*, 2014 COA 127, ¶ 50. We also review questions of law de novo, including whether a contract is ambiguous. *Id.*

¶ 28     "The primary goal of contract interpretation is to determine and give effect to the intent of the parties." *Vu, Inc. v. Pac. Ocean Marketplace, Inc.*, 36 P.3d 165, 167 (Colo. App. 2001). A contract is ambiguous if it is susceptible of more than one reasonable interpretation. *Cheyenne Mountain Sch. Dist. No. 12 v. Thompson*, 861 P.2d 711, 715 (Colo. 1993). Where an ambiguity exists, a court may look at extrinsic evidence to discern the parties' intent. *Vu*, 36

P.3d at 167; *see also Pepcol Mfg. Co. v. Denver Union Corp.*, 687 P.2d 1310, 1314 (Colo. 1984) ("It is only where the terms of an agreement are ambiguous or are used in some special or technical sense not apparent from the contractual document itself that the court may look beyond the four corners of the agreement in order to determine the meaning intended by the parties.").

¶ 29    A court may look to extrinsic evidence to discern the parties' intent even when a contract contains a merger clause, so long as the extrinsic evidence isn't used to "demonstrate an intent that contradicts or adds to the intent expressed in the writing." *Nelson v. Elway*, 908 P.2d 102, 107 (Colo. 1995); *see also KN Energy, Inc. v. Great W. Sugar Co.*, 698 P.2d 769, 777 n.9 (Colo. 1985). The extrinsic evidence a court may consider includes local usage, the circumstances surrounding the making of the contract, or "any pertinent circumstances attendant upon the transaction, including the conduct of the parties under the agreement." *Pepcol*, 687 P.2d at 1314; *see KN Energy*, 698 P.2d at 777.

### 2.    Application

¶ 30    We first discuss whether section 4 of the APA unambiguously required JERB to assume the lease on Unit 101 or whether the

provision is susceptible of more than one reasonable interpretation. After concluding the phrase "in a form to be agreed upon" in section 4 is ambiguous, we look at the undisputed evidence regarding the parties' conduct both surrounding the making of the APA and under the APA to discern the parties' intent, if we can.

a. Whether Section 4 of the APA is Ambiguous

¶ 31 On appeal, the plaintiffs argue that section 4 unambiguously required JERB to assume the lease on Unit 101, and the trial court therefore erroneously relied on extrinsic evidence to arrive at the opposite conclusion. On the other hand, JERB contends on appeal that the plain language of section 4, including the phrase "in a form to be agreed upon," unambiguously created a condition to closing; namely, that the parties to the APA — the plaintiffs, JERB, and the Landlord — had to come to a mutual agreement on the lease assignment and assumption agreement before JERB was required to assume the lease and marijuana cultivation licenses as contemplated by the APA, and the trial court correctly concluded as much.

¶ 32 We first conclude that the phrase "in a form to be agreed upon" in section 4 of the APA is susceptible of more than one

14

reasonable interpretation. Based on our independent review, we can reasonably arrive at either party's interpretation of section 4 and JERB's corresponding rights and duties under the APA. From the four corners of the agreement, it isn't clear whether "form" means the structure of the agreement, as the plaintiffs contend, or the terms of the agreement, as JERB contends.

¶ 33 Because we can't discern the parties' intent based on the four corners of the agreement, we conclude that the provision is ambiguous. Therefore, it is appropriate to look at extrinsic evidence to discern what the parties' meant by the directive in section 4 that the parties "shall enter into an assignment and assumption agreement in a form to be agreed upon" at closing and whether a condition to closing was created by this language.

b. The Parties' Intent Under the APA

¶ 34 We next examine the undisputed evidence of the parties' conduct both during the making of the APA and under the APA to discern what the parties intended this provision to mean.

¶ 35 Ordinarily, after concluding that a relevant portion of a contract is ambiguous, we would remand to the trial court to determine the factual question of the intended meaning of the

15

ambiguous provision, respecting the allocation of responsibilities in a case tried to a jury. *See, e.g.*, *Sch. Dist. No. 1 v. Denver Classroom Tchrs. Ass'n*, 2019 CO 5, ¶ 14 (When a court determines that a contract is ambiguous, "the meaning of its terms is generally an issue of fact to be determined in the same manner as other disputed factual issues." (quoting *Dorman v. Petrol Aspen, Inc.*, 914 P.2d 909, 912 (Colo. 1996))). As discussed below, however, on the specific record presented in the context of the parties' cross-motions for summary judgment, we conclude (drawing all reasonable inferences in favor of the plaintiffs) that the facts relevant to the determination of the meaning of the contract allow only one possible interpretation: JERB had the right to terminate the contract because no lease containing terms and conditions to its satisfaction (both as to form and content) was executed. Because this is the same meaning that the trial court accorded to the contractual provision, the fact that the trial court did so on a different, and what we conclude to be erroneous, basis renders that error harmless. *See* C.A.R. 35(c) ("The appellate court may disregard any error or defect not affecting the substantial rights of the parties."); *cf. Emp. Television Enters., LLC v. Barocas*, 100 P.3d

16

37, 42-43 (Colo. App. 2004) (holding that a court's erroneous failure to consider evidence of trade usage in interpreting a contract was harmless because doing so wouldn't have changed the outcome of the court's ambiguity analysis).

¶ 36    We begin our analysis by addressing the plaintiffs' argument that because the APA contains a merger clause, under *Nelson* a court can't look at extrinsic evidence to discern the parties' intent. Contrary to the plaintiffs' contention, *Nelson* doesn't stand for the premise that anytime an ambiguous contract contains a merger clause a court can't consider extrinsic evidence to discern the parties' intent.  Rather, *Nelson* provides that a court can rely on extrinsic evidence to discern the parties' intent so long as the court doesn't use it to *contradict* or *add* to the intent expressed by the writing itself.  908 P.2d at 107.  Because we merely aim to discern what the parties meant by the directive in section 4 — namely, that the parties "shall enter into an assignment and assumption agreement in a form to be agreed upon" at closing — we will look at extrinsic evidence to ascertain the meaning the parties' assigned to the phrase "in a form to be agreed upon" under the APA.  *Pepcol*, 687 P.2d at 1314.

¶ 37    To discern the parties' intent of section 4, we, like the trial

court, look at the parties' conduct under the agreement, as well as

the circumstances surrounding the making of the APA and any

other "pertinent circumstances attendant upon the transaction."

*Pepcol*, 687 P.2d at 1314; *KN Energy*, 698 P.2d at 777.  All of this

evidence points to the interpretation urged by JERB and reached by

the trial court.

¶ 38    Based on our independent review of the undisputed evidence

before the court at summary judgment and drawing all reasonable

inferences in favor of the plaintiffs, we conclude that the parties

intended the phrase "in a form to be agreed upon" to mean that all

parties to the APA had to come to an agreement about the terms of

the assignment and assumption agreement as a precursor to

closing.  In addition to the undisputed evidence the trial court relied

on during the summary judgment stage, the record also establishes

that (1) JERB intended to use Unit 101 for marijuana cultivation

and needed to substantially invest into the property to bring it into

compliance with local code; (2) JERB expressly communicated its

desire to condition the transaction on the contemplated lease

extension in its letter of intent, which was sent to Havana prior to

execution of the APA; (3) within days of executing the APA, JERB reached out to the Landlord to discuss a lease term extension as part of the assignment and assumption agreement; (4) while the Landlord was open to granting a lease term extension to JERB, the Landlord couldn't agree to an assignment of the lease on Unit 101 until 51st Property came current on its rent and the Landlord communicated this to the parties; (5) in the change of ownership application for Unit 101's marijuana cultivation licenses that JERB and Havana sent to the MED, the Landlord expressed in a letter that the lease assignment was contingent on the Landlord and JERB coming to "mutually agreeable terms for any contemplated extension" of the lease on Unit 101; (6) for the six months following the execution of the APA, the Landlord and JERB negotiated a lease extension as part of the assignment and assumption agreement; and (7) JERB only ceased negotiations with the Landlord after the six-month timeline for final governmental approval provided for under section 17 of the APA had lapsed. Based on this evidence in the record, we conclude that the lease extension was a "pertinent circumstance[] attendant upon the transaction" contemplated by the APA. *Pepcol*, 687 P.2d at 1314.

¶ 39    On the other side of the balance, the plaintiffs point to one thing favoring their urged interpretation: the plain language of section 4 of the APA. Indeed, the plaintiffs don't identify any evidence in the record beyond the language of section 4 itself to support their urged interpretation. Given that all of the evidence before the court on summary judgment lined up against this interpretation, the only way the plaintiffs' urged interpretation could have carried the day would have been if the disputed provision *unambiguously* had the meaning that they urged. But for the reasons discussed in Part II.A.2.a above, we reject the contention that the language is unambiguous — in either side's favor. Thus, given the weight and undisputed nature of the evidence in the record, we conclude that even though the meaning of the language is ambiguous, there isn't a triable issue regarding the meaning of that language.

¶ 40    Having determined that the meaning of section 4 didn't present a triable issue, we further conclude that the court's error in its ambiguity determination was harmless. After all, it's undisputed that after JERB and the Landlord negotiated for six months, the parties never agreed on the form of the assignment and assumption

agreement, which the trial court correctly found at the summary judgment stage. That left only the remaining question of whether JERB breached its duty of good faith and fair dealing during negotiations when it ceased negotiations with the Landlord and terminated the APA. This question was litigated at trial and after a five-day trial, the jury returned a verdict in the negative. Consequently, the trial court's error in its ambiguity analysis was harmless because we reach the same conclusion as the trial court regarding the meaning of section 4 of the APA.

### B. The Evidentiary Issue Preserved by Objection

¶ 41 The plaintiffs next contend that the trial court erred by barring evidence of JERB's alleged breach of two provisions of the APA for lack of relevance because, the plaintiffs argue, this evidence was probative of the material issue in dispute — namely, whether JERB acted in bad faith during the transaction. Specifically, the plaintiffs assert that the trial court precluded evidence showing that JERB breached two sections of the APA: section 10(c), which barred JERB from engaging a real estate broker, and section 16(b), which memorialized that all parties would "take all steps reasonably necessary to carry out the intent" of the APA. JERB argues that the

plaintiffs have mischaracterized the record by claiming that the trial court excluded evidence of JERB's alleged breach of the APA, pointing out that the court admitted evidence at trial that JERB engaged a real estate consultant, Atlas Realty, and further allowed the plaintiffs to both present evidence of section 16(b) and argue how it was relevant to JERB's breach of its duty of good faith and fair dealing. We agree with JERB.

¶ 42    We review a trial court's evidentiary rulings for an abuse of discretion. *Hock v. N.Y. Life Ins. Co.*, 876 P.2d 1242, 1251 (Colo. 1994). A court abuses its discretion if its decision is manifestly arbitrary, unfair, or unreasonable, or if the court misapplies the law. *Tisch v. Tisch*, 2019 COA 41, ¶ 33. A trial court doesn't abuse its discretion when it precludes a party from presenting evidence of a claim that isn't included in the trial management order. *Ehrlich Feedlot, Inc. v. Oldenburg*, 140 P.3d 265, 272-73 (Colo. App. 2006).

¶ 43    In the trial management order, the plaintiffs' sole breach of contract theory was that JERB had breached its duty of good faith and fair dealing under the APA. During trial, each time the plaintiffs attempted to introduce evidence of JERB's alleged breach of sections 10(c) and 16(b), JERB objected on relevance grounds.

The trial court sustained many of JERB's objections but overruled a few of them.

¶ 44    We conclude that the trial court didn't abuse its discretion. While the court sustained some of JERB's objections to evidence that it consulted a real estate consultant, it was in the context of the plaintiffs attempting to introduce evidence that JERB breached an express term of the APA by hiring a broker, which wasn't a litigated claim in the case.

¶ 45    Regarding evidence of JERB's obligations under section 16(b), again, the court merely sustained objections when the plaintiffs attempted to introduce evidence that JERB expressly breached this provision, which wasn't a claim in dispute. In fact, the plaintiffs were allowed to present other testimony regarding section 16(b) over JERB's objection to the relevance of this evidence.

¶ 46    Accordingly, the trial court didn't abuse its discretion when it sustained JERB's objections at trial and precluded evidence of JERB's alleged breach of two sections of the APA for lack of relevance because any claim of JERB's alleged breach of these provisions wasn't included in the trial management order and wasn't an issue at trial.

## C. 51st Property and Havana's Unpreserved Issues

¶ 47    Finally, the plaintiffs argue that the trial court erred by referring to the plaintiffs' counsel as "disingenuous" in front of the jury; "advocating" for JERB by offering the basis for evidentiary objections in front of the jury; and instructing the jury that the plaintiffs' conduct was "wrongful." The plaintiffs acknowledge that none of these issues are preserved for our review.

¶ 48    Generally, appellate courts don't review issues raised for the first time on appeal. *Marcellot v. Exempla, Inc.*, 2012 COA 200, ¶ 11. The plaintiffs nevertheless urge us to exercise our discretion and apply plain error review. But "[s]uch discretion . . . is exercised very rarely in civil cases, typically only where necessary to prevent manifest injustice." *Id.* This standard is a stringent one and to warrant plain error review in a civil case, a party must demonstrate that the error "almost surely affected the outcome of the case." *Robinson v. City & Cnty. of Denver*, 30 P.3d 677, 685 (Colo. App. 2000) (quoting *Champagne v. United States*, 40 F.3d 946, 947 (8th Cir. 1994)).

¶ 49    Here, the plaintiffs don't demonstrate that any of these alleged errors "almost surely affected the outcome of the case." *Id.* (quoting

*Champagne*, 40 F.3d at 947). Rather, the plaintiffs merely make conclusory assertions, without citing any record support, that they suffered prejudice as a result of the court's "disingenuous" remark; they were "deprived of a fundamentally fair trial" as a result of the court's alleged "advocacy" for JERB; and "no reasonable jury could find in favor of [the plaintiffs] when instructed . . . that their conduct was 'wrongful.'" None of these contentions merit review for plain error.

¶ 50    Accordingly, we decline to address the plaintiffs' issues raised for the first time on appeal.

### III.    Disposition

¶ 51    For the reasons discussed above, we affirm the judgment of the trial court.

JUDGE SCHOCK and JUDGE BERGER concur.